Our third case this morning is Riley v. City of Kokomo, case number 17-1701. Thank you, Your Honor. May it please the Court. All during the employment of Angela Riley with the Kokomo Housing Authority, which is abbreviated KHA, she and other employees were told that they were eligible employees for FMLA leave. KHA went further and granted her FMLA leave, gave her certificates for FMLA leave, had her fill-out certificates for FMLA leave, and granted FMLA leave for years. In about March of 2014, and she had been employed since 2008, started taking FMLA leave in about 2010, in about March 2014, KHA told Riley that she had exhausted her FMLA leave, which is a surprise to her because she had been shown leave schedules which showed that she had positive balances. KHA told her that she should quit, receive Social Security disability benefits. She did not want to quit and did not quit. Shortly thereafter, on March 31, 2016, KHA gave her her first discipline of a written warning, the first discipline she had ever received in the five years of her employment. Did she get any warnings or discipline after that fight with the tenant back in 2010? No, Your Honor, and there was no discipline, was not involved with her employment at all, and after she was terminated, it was not an issue until after she was terminated, and KHA went back to find any negative thing they could about her to just throw at her. Defendants do that when they get sued. And so what I'm pointing out is that it was not raised during the employment and was not an issue for employment. As a matter of fact, she was merely, she was taking her custodial daughter home where the father's girlfriend, who was not letting the mother come and get her daughter, the mother reached in the screen, unlocked it, got her daughter, take her home, and then there was testimony that there was an altercation, but we don't know what that was. But Ms. Riley says she was just taking her daughter home and would not let the girlfriend take her inside. So Riley was doing what she was supposed to do. She did technically assault. The lady did reach in the screen, but she could probably be commended for part of those things that she was doing, which was taking her custodial daughter home. So the March 31, 2016 written warning was based on false allegations. The warning stated that she allowed a tenant to move into another unit, which was not true because she was not the one who had the authority to, or did give the authority for that tenant to move. She did what she was supposed to do, which was just to allow the tenant to see the unit, and then it was up to the other employees to do the paperwork to authorize the move. And they did authorize the move and signed off on it, and then when it was discovered that that unit did not have handicapped access or handicapped equipment, then they went back and said, well, who authorized this, and tried to blame her. The lady who did authorize it at the beginning was Margaret King. She was only given a verbal warning, and then there were people above her who approved it. They were given no discipline whatsoever. This is very upsetting too, Angela Riley. Her stress increased. She has a bipolar disorder, which causes seizures. Her stress increased. She went to the hospital in April of 2014, and then in May, on May 7 of 2014, she discovered that someone else had done much worse with regard to the paperwork for tenants than she had done, she was accused of doing. And someone said to her, who's moving into Unit 193, Pine Street Unit? And she said, well, we don't have any paperwork for that. And she tried to find out who it was, wanted to meet with the CEO, asked to meet with the CEO. The CEO said she could not meet with her, and that it was a special situation, which upset Ms. Riley, because there are no special situations that allow anybody to move into public housing without proper paperwork. So someone was doing much worse than she had done. There was no paperwork on these people, and when someone moves into public housing, the housing people need to know that someone's in there for fire, burglary, robbery, protection for if a fire happens, who's there, who needs to get out, and for all of the other administrative reasons. So this was a terrible violation that was being allowed to occur apparently by the CEO, who had said through a third party, through another employee, that it was a special situation. Someone was getting special treatment, that was by the other employees who had no disability and had not complained about discrimination. They were allowed to move someone in with no paperwork, whereas she, who had merely given someone the right to inspect or look at property, she was given discipline and these other people were not. So the procedures for KHA say that if there is a problem, to call HUD in Indianapolis. She called the HUD office in Indianapolis. The HUD office told her to call the Civil Rights Department. She did that, and her door was open, everyone in the office could hear what she was doing. They said that she was distressed, they knew she was distressed, her voice was distressed. She has bipolar disorder with seizures coming on when she's stressed, and they placed more stress on her. After the CEO said, I can't see you, go see the HR manager, the HR manager was not in, so she reported it to HUD. The CEO then sent a third party to her to say, I can see you now. Now, HUD or KHA later said, as Judge Hamilton mentioned, trying to make anything negative after the termination or after a problem arises, said that she was given a direct order to come to the CEO's office. That is not true, it's not supported by the facts, and it's disputed by Riley. But when Riley was told, the CEO can see you now, she, on her own initiative, called the CEO and said, you know, I've already reported this to HUD, there's no reason for me to talk to you now, HUD's handling it. The CEO then did not say, I'm ordering you to come to my office, or I want you to come to my office, or anything like that. Instead, the CEO said, you know, whenever you complain, it costs KHA money, instead of taking the attitude that whenever KHA violates the rules, it costs KHA money. Mr. Dorris, could I ask you two specific questions about this incident? Yes, your honor. One, what evidence is there from Riley about the content of what she told HUD, and whether it constituted any kind of protected discrimination claim? Second, do you have any specific evidence to dispute the defendant's evidence about the timing of the decision to fire a plaintiff on May 7, 2014? Thank you. Ms. Riley was in a state of stress and distress, and cannot remember exactly what she told HUD, but she remembers that she was told by HUD to call the Civil Rights Department. That's it? Correct. Okay. How about the timing issue? The timing issue is very interesting, in that she was stressed, distressed, had to go home, and could not report for the following day, Thursday. She had two seizures that day, Friday, came back Monday. On the HUD side... I'm talking about the timing of the email, and the change from suspension to termination. Right. So the email from the CEO said, I want to suspend Riley. A notice of discipline was started on that date. We don't know what it said. It was not produced. The draft was not produced by KHA. The only thing that was produced by KHA was the final termination notice given to her on the following Monday. KHA claims that the CEO emailed a draft to the HR manager on, I believe, the 7th, and then changed it on the 8th, and emailed it again to the HR manager, and KHA has not produced either email. So we do not have either email or the first draft. Now, KHA's argument is, the CEO made a mistake when she said suspension, and she meant termination. We argue that's unbelievable. We certainly argue, even if it's not totally unbelievable, it creates suspicious circumstantial evidence for an issue of fact, as to whether the CEO would write, I want to suspend Ms. Riley, and then say, whoa, I meant, I want to terminate her just at that time. But there's a termination document that was created on the 7th, according to the metadata. The metadata shows that the original document started then, and was modified later. It was modified, I believe, on the 8th, and signed on the 9th. The 8th was when Ms. Riley no longer appeared at the office, and the CEO and the people in the office would be very observant as to whether she was there, or whether she was taking leave. You could see that she was on leave, she was not there. Ms. Riley then called on, there's an email recording, excuse me, a voicemail recording on the 9th, saying, I had two seizures yesterday, I'm at risk of having a seizure today, so I won't come in. And then she came in on Monday, and was immediately terminated. So the circumstantial evidence shows that the change, and the KHA never said what this change was. They're saying, they're implying it was not a change from suspension to termination. But the logical inference is that it was a change from suspension to termination. They never granted her request for taking leave, for FMLA leave on the 8th, or for vacation leave on the 9th, which was an ADA accommodation, should have been an ADA accommodation leave. The failure to accommodate issue was raised in the motion for summary judgment on opening, but was not continued on reply, and was given up on reply. And the facts of the accommodation request for leave, which is request for accommodation, was in the EEOC charge. So the facts were in the charge. Ms. Riley said, we did not include failure to accommodate, that phrase, in the EEOC charge, but the facts were there, repeated that she had requested FMLA leave and vacation leave, which qualified as ADA accommodation. Under discrimination and retaliation, the district court ignored all of our evidence, and especially the evidence of 25 items, which showed pretext and the lack of honest belief. On the complaint to HUD, the complaint to HUD was not only a complaint that HUD said called the Civil Rights Department, but it was also the culmination of many complaints that she had made of discrimination over the years, and the HR manager told her when she received the EEOC charge of discrimination, the HR manager wouldn't tell her and said, well, you just complained to me. Let me save my time. Thank you. That's fine. Mr. Palmer. Good morning, Your Honors. May it please the Court, my name is Mike Palmer, I represent the Impelli, the Kokomo Housing Authority. The district court granted the Housing Authority summary judgment for two reasons. First, the district court held that Ms. Riley waived or forfeited each of her claims by failing to sufficiently respond to dispositive arguments made by the Housing Authority, and secondly, found in favor of the Housing Authority on the merits of the claim, finding that there were undisputed facts that defeated each of her claims. If I could first turn to the substance of arguments and the issues that were raised in the appellant's oral argument, I want to address a few issues. First of all, with regard to discriminatory intent, and opposing counsel alluded to potential comparator evidence, evidence of other individuals who have engaged in similar, alleged similar misconduct, but were treated differently than Ms. Riley. All of those individuals that were alluded to are unnamed. There's no evidence in the record regarding who allegedly had approved the transfer that came to light on May 7th, and that they claim was an improper transfer. There's no evidence suggesting that that transfer was comparable to what happened with the issue that Ms. Riley was disciplined for in March of 2014. There's no evidence regarding who those folks were, or what their disability status was, or whether or not they had engaged in protected activity. Ms. Riley simply has not introduced any of that evidence, so I believe that opposing counsel stated in oral argument that there was evidence that the comparators were not disabled and had not engaged in protected activity, and that's not true. Secondly, the issue of the May 7th, 2014 complaint to HUD came up during an oral argument, and the question was what evidence is there of what was said to Nathaniel Johnson of HUD on May 7th? And the only evidence that's in record is the deposition of Ms. Riley. And when asked what she said to Mr. Johnson, she didn't say she doesn't remember. She said that she wanted to report a fraudulent activity or something that she suspected was inappropriate, referring to the, so she was referring to the unauthorized tenants moving into the housing authority, and that he told her in response that he would send the information to Forrest Jones, which was his boss, and that she should also take it up with the Civil Rights Department. That's the full extent of that conversation with Mr. Johnson. We don't have to guess as to what was said. We know what was said, and there's no statement, there's no mention by her of discrimination, of protected classes, anything that would suggest that she was reporting discrimination. Also, that, her conversation with Mr. Johnson, there's no evidence that Ms. Cook knew about that conversation prior, the specifics of that conversation prior to making the decision to terminate Ms. Riley's employment. Basically the evidence is that some of Ms. Riley's co-workers may have overheard her making that complaint to HUD, but there's no evidence that that was reported to Ms. Cook. The evidence that Ms. Cook knew about the complaint to HUD was that Ms. Riley, during her conversation with Ms. Cook, mentioned that she had made a report to Indianapolis, at least according to Ms. Riley's version of events. And Counsel, on the record, it's undisputed that it was Ms. Cook alone who had the authority to terminate Ms. Riley, is that correct? That's correct. And that she alone made the decision to terminate Ms. Cook. And she did that on the 7th? I'm sorry, Ms. Riley. Yes. She did that on the 7th, and it was she who created the document that reflects that? That's right. So May 7th, and that's the final issue I wanted to address that came up, was that the timing of the termination decision on May 7th, which is when there was an altercation with Ms. Cook, honestly believed, reasonably believed, amounted to insubordination. She created, she sent an email mistakenly saying that she wanted to suspend Ms. Riley, but right away, that day, she creates the termination document on May 7th. Is it a separate document? It is in evidence, it's a, yes, it's a separate termination notice that sets forth the basis for the decision to terminate her. And that, we know from the metadata, that it was created on May 7th, and it was finished on May 8th. And so I think that the timing is interesting to the court, most likely, because the question is, well, when did she make her FMLA request to take additional time off? And what we know about that is that on May 8th, she didn't come to work. She called, but she didn't leave any messages. On May 9th, after the final version of the termination notice had been completed, is when she left a voicemail message alluding to the fact that she was going to take FMLA on May 9th or May 8th. So that occurred after the document was undisputedly completed. Also, there's no evidence that Ms. Cook ever heard the voicemail message that had been left regarding Ms. Riley wanting to take FMLA leave in early May. Substantively, I'd also like to point out that Ms. Riley relies heavily on promissory estoppel and equitable estoppel to support her FMLA claims. First of all, those were waived, weren't properly addressed at the district court level. Well, there was some mention of estoppel. You say in your complaint, or in your brief rather, that her promissory estoppel claim fails because she never alleged it in her complaint. Right. Where does that come from? It's a response to an affirmative defense that you raised. There's two different doctrines here. There's promissory estoppel, which is a separate claim under Indiana law. And there's equitable estoppel, which is, as you mentioned, a doctrine that she can raise in response to the housing authority arguing in defense that the Family and Medical Leave Act does not apply. So you're right in that she does not have to allege equitable estoppel as a separate claim. However, promissory estoppel is- There's no independent claim for relief. But let me ask you, if you're an employee, I'm looking at, this is, there are several choices. This happens to be A37 in the blue brief. It's the form WH381, Notice of Eligibility and Rights and Responsibilities, Family and Medical Leave Act. On March 28, 2010, you informed us that you needed leave beginning intermittently for your own serious health condition. This notice is to inform you that you are eligible for FMLA leave. How do you understand that? With respect to employer grace versus legal rights. I'm sorry, what was the last part of that question? I thought your position was, as an employer here, that you have a family and medical leave policy that you're not actually required to follow under the act. Maybe I'm misunderstanding some nuances here. No, you're right, that there is a family and medical leave policy in the handbook. And the issue in this case is, do the representations that were made by the Housing Authority give rise to an equitable estoppel claim, prohibiting the employer from asserting the defense that Ms. Riley was not an eligible employee under the statute. And with regard to the issue that you raised, that goes to the first element of equitable estoppel. That is, was there a misrepresentation regarding eligibility? And you are eligible for FMLA leave? I think under the case law that she would be able to clear the first hurdle of an equitable estoppel position, but she has not cleared the other hurdle, which is to establish detrimental reliance. In fact, she hasn't raised that at all in her brief at the district court level, nor does she raise it in the appellate court. And we have to remember... There's also a disclaimer in the handbook, is there not? And I'm talking now about equitable estoppel. So with regard to promissory estoppel, the issue that was in the Gilead case, you're right that she cannot establish a promissory estoppel claim based on the representations made with regard to the Family and Medical Leave Act, because she had no reasonable reliance on that. Have you all told the rest of your employees that they're not actually eligible, despite getting, I assume, these kinds of notices every time somebody asks for leave? There's not an issue of whether or not they're getting the leave. Ms. Riley received more leave than she was... I understand that, but I'm just... As an employer, you're taking a somewhat startling position in light of the paperwork. Well, there's a lot of employers that have to include a Family and Medical Leave Act policy in their handbook when they're a covered employer, even though they don't have facilities that are where an employee at the facility would be considered an eligible employee, because they don't meet the benchmark of having 50 employees within a 75-mile radius. So the appropriate thing to do in the policy, which I believe has been done, is to explain that eligible employee does include the factor of you have to have 50 employees within a 75-mile radius. But she has not... Getting back to the detrimental reliance, for the claims, for the cases that have recognized the equitable estoppel theory to support an FMLA claim in other cases, there has been detrimental reliance. So there has, for example, been situations where an employee believed that an absence was covered by the FMLA, the Act, and it wasn't, it was disciplined for that, and that is considered to be detrimental reliance. Here, Ms. Riley has suffered no harm, even if an equitable estoppel theory is accepted by the court, she would have to establish that she did not obtain leave for which she was eligible. And she cannot establish that, because the undisputed facts show that in March, February 2014, March 2014, when she was requesting this leave, she had already exhausted all the leave that she would have been entitled to under the FMLA, the Act. Therefore, she would not have, even if the Act applied, been entitled to additional leave. I'd also, before my time expires, like to touch on the issue of forfeiture and waiver. And that is that, in large part, the district court also relied on the fact that Ms. Riley waived or forfeited each of her claims because she did not respond at all to arguments posed by the housing authority in the summary judgment brief, or did not develop those arguments sufficiently. And that forfeiture, that waiver, follows her to the appellate court and applies here. She forfeited her exhaustion of administrative remedies argument by not developing it at the district court, adverse action arguments, pretext arguments, promissory and equitable estoppel arguments at the district court level. Those simply were not developed, and therefore she waived them, unless she can establish that the interest of justice require this court to evaluate that decision for plain error. Ms. Riley has made no effort to argue in her briefs or in oral argument that the interest of justice should result in review of that forfeiture decision. Mr. Palmer, what do you make, what do you think we should make of the list of the 25 items, pages 22 to 25, I'm sure you know them, that plaintiffs say support an inference of pretext here? That is an example of an undeveloped argument. There is no argument regarding why those 25 instances amount to evidence of discriminatory motive or retaliatory motive. They're all lumped together and left to the court to guess, is this evidence of discriminatory motive? Is this evidence of retaliatory motive? There's no explanation, no analysis, no application of the facts or application to case law to suggest that those facts indicate pretext or indicate discriminatory or retaliatory motive. So it's difficult to respond because there's been no analysis to say this shows discriminatory intent or this shows retaliatory intent for some reason. And we've given examples in our brief as to why those various facts don't show discriminatory intent or don't show retaliatory intent. I think the one that's most frequently relied on is the reference to Social Security Disability Insurance that was allegedly made by Ms. Morrow. They claim in March 2014, I believe the evidence reflects that that comment was actually made in 2012. But assuming for purposes of argument it was made in 2014, the fact is that Ms. Riley actually did apply for Social Security Disability Insurance benefits. There's no inference to be drawn that Ms. Morrow was suggesting a discriminatory intent by asking her about... She applied while she was still employed by the health authority? She was still employed but she was struggling to work. It was on the heels of taking continuous leave for more than a month and having intermittent leave twice a week throughout her tenure of employment. So there's been no explanation as to why that alleged fact suggests discriminatory intent. And even if it had, Ms. Morrow was not involved in the termination decision. I see my time has expired. For the reasons that I've explained and that are in our brief, we ask that you affirm the District Court's decision. Thank you. Mr. Durst. Thank you, Your Honor. Ms. Morrow was involved in the termination decision and actually did give the termination decision to Ms. Riley and terminated her. As a matter of fact, this is a small office and it shows that the CEO and the HR manager worked together to try to imply that the CEO and the HR manager did not know what was happening to this employee or that she was taking leave just ignores all of the realities of the situation and all of the circumstantial evidence. They worked together on it and it would have been a very rare situation for the HR manager and the CEO not to talk about this employee who was terminated, who was highly stressed, who had asked to see the CEO and the CEO said, every time you make a complaint, it costs us money. Mr. Durst, your time has expired. Thank you. Our thanks to both counsel. The case is taken under advisement.